UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                    :

YALEISY MORENO MORENO,        :

                   Petitioner,    :            15-CV-2372 (JPO)

                               :

           -v-                :          OPINION AND ORDER

                               :

WANDY JOSE BASILIO PENA,    :

                   Respondent.  :
------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

      Petitioner Yaleisy Moreno Moreno ("Moreno" or "Petitioner") initiated this case on

March 31, 2015, against Wandy Jose Basilio Pena ("Basilio" or "Respondent"), seeking the

return of their child, WKBM, to the Dominican Republic pursuant to the Hague Convention on

the Civil Aspects of International Child Abduction (the "Hague Convention" or the

"Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg.

10,494 (Mar. 26, 1986).  For the reasons that follow, the petition is denied.

**I.      Background**

      **A.     Facts**[1]

      WKBM was born on August 12, 2009, in the Dominican Republic.  (Dkt. No. 1 ("Pet.")

Ex. C.)  Her mother, Moreno, and father, Basilio, are both nationals of the Dominican Republic.

(*Id.*)  There is no evidence that Moreno and Basilio were ever married or otherwise in a

formalized relationship, nor is there evidence that any Dominican court has made any decision

regarding custody over WKBM.  The parties agreed that WKBM's habitual residence until April

2014 was the Dominican Republic.  (Dkt. No. 20 ("Trans.") at 12-13.)

---

[1] The following facts are largely drawn from the testimony of the parties and evidence offered
during a hearing conducted before the Court on April 27, 2015.  (*See* Dkt. No. 20 ("Trans.").)
Certain documents attached to the petition were also admitted into evidence.  *See* 22 U.S.C.
§ 9005.

Beyond these most basic points, WKBM's parents reported conflicting accounts of WKBM's whereabouts and their agreements concerning her custody from 2013 until the present. While the Court acknowledges that difficulties in translation and a poor telephone connection during a factfinding hearing may have impeded clarity at times, there is no way to avoid fundamental divergences in the parties' testimony.

### 1.    Moreno's Testimony

Moreno testified that WKBM lived with her at all times from her birth until mid-2013, and that WKBM had never lived with Basilio.  (Trans. at 25.)  According to Moreno, Basilio never sent money for child support while WKBM was living with Moreno in the Dominican Republic.  (*Id.* at 40.)

In 2013, WKBM first visited Basilio in New York for a trip of about three months.  (*Id.* at 24-25.)  It was unclear when precisely the trip took place, in Moreno's version, although it appears to have covered some or all of the months of September and October 2013.  (*Id.* at 22.) Moreno said that the trip was initially intended to be two months long, but that Basilio asked Moreno to extend the trip so that he could accompany WKBM back to the Dominican Republic in or around October 2013.  (*Id.* at 25.)

In April 2014, Moreno says, she agreed with Basilio that WKBM would take a 15-day trip to visit Basilio in the United States.  (*Id.* at 77-78.)  While Moreno and Basilio signed a written authorization permitting WKBM to travel outside the country, the agreement limiting the trip to 15 days was verbal only.  (*Id.* at 19.)  Moreno testified that WKBM did not have a vacation at that time, and, as a result, WKBM missed school for the trip.  (*Id.* at 20.)  WKBM brought only a few suitcases and a bag of candy, and all of her other belongings remained in the Dominican Republic.  (*Id.* at 20-21.)  Moreno denied ever agreeing that WKBM would come to reside permanently in the United States.  (*Id.* at 26.)

Moreno said that, about a week after WKBM left for the United States, Basilio told her that WKBM would not return to the United States.  (*Id.* at 21.)  Moreno reminded Basilio that it was a school period and that WKBM would miss classes, but Basilio told her that WKBM would not return to the Dominican Republic and would not be able to speak with WKBM by telephone if she called.  (*Id.* at 22.)  In more recent times, Moreno said, she has spoken to WKBM about every two or three days, though on the day of the hearing it had been nine days since Moreno had been able to speak with her.  (*Id.* at 28-29.)

A significant portion of Moreno's testimony focused on WKBM's status as a permanent resident of the United States—how WKBM obtained permanent residency (or, colloquially, her "green card"), and Moreno's degree of knowledge and involvement in the process.  The testimony on this point contained important discrepancies.

Initially, Moreno said that she had never signed any document in support of a permanent residency petition on behalf of WKBM, and further testified that she had never discussed the idea of seeking permanent residency for WKBM with Basilio.  (*Id.* at 26, 30.)  She asserted that she never agreed that WKBM should get a green card and in fact objected to the idea.  (*Id.* at 30-31.)  Moreno went on to testify that she never came to learn that Basilio was in the process of obtaining a green card for WKBM and that, to her knowledge, WKBM "doesn't have a green card."  (*Id.* at 34.)

By later in cross-examination, however, Moreno gave testimony that raised questions about, and sometimes directly contradicted, her earlier statements.  In discussing the preparations for WKBM's 2013 trip to the United States, Moreno stated that she took WKBM (at Basilio's request) to get a medical examination (for which Basilio paid), but said she thought the purpose of the exam was in order for WKBM to get a travel visa, not a green card.  (*Id.* at 32-33, 36, 41.)  Later, however, Moreno said that it was in fact her mother who brought WKBM to the clinic for

3

a medical exam, and that she was not present.  (*Id.* at 42-43.)  Then, Moreno said that she took WKBM to the U.S. Consulate in the Dominican Republic, where Moreno produced WKBM's passport[2] and birth certificate, delivered the medical examination results, and answered a question about WKBM's address.  (*Id.* at 43-44.)  Moreno denied signing any documents as part of the process, but conceded that she did not inform consulate staff that she did not consent to WKBM's residency in or travel to the United States.  (*Id.* at 44-45.)

Moreno testified that when WKBM visited Basilio in 2013, she traveled with "her passport, a medical card, . . . another ID that she doesn't know what it is, and her birth certificate."  (*Id.* at 35.)  WKBM returned to the Dominican Republic from the 2013 trip with the passport and the permanent residency card, which Moreno held for her.  (*Id.* at 40.)  Moreno maintained that she did not know what the permanent residency card was.  (*Id.*)  She also said that Basilio told her that it was mandatory for WKBM to come to the United States every six months, though he did not tell her the length of time she would have to stay on each visit.  (*Id.* at 45-46.)  Moreno at first said that Basilio did not tell Moreno the reason for these visits, but then, when asked whether Basilio informed her that otherwise WKBM would lose her "permanent card," she said "Yes."  (*Id.* at 46.)

Toward the end of the hearing, Moreno said (in possible tension with her earlier statements) that her understanding was that WKBM would "travel every six months" and "be coming back and forth" between the Dominican Republic and the United States.  (*Id.* at 78.)  In April 2014, Moreno stated, she understood that WKBM would visit the United States on that occasion for 15 days, but then would "decide when she gets old enough to make her own decision to either stay in the United States or the Dominican Republic."  (*Id.*)

---

[2] Basilio had previously provided the funds to permit Moreno to apply for a passport on WKBM's behalf.  (Trans. at 35-36.)

### 2.    Basilio's Testimony

Basilio testified that he came to the United States on December 28, 2012, having received permanent resident status through his parents' status. (*Id.* at 48.) He said he applied for permanent residency on WKBM's behalf in February 2013, with Moreno's consent. (*Id.*) He stated that WKBM received approval for a green card in April 2013 and came to visit him in New York for the first time that month.[3] (*Id.* at 49.) Basilio said that he agreed with Moreno that he would send WKBM back to the Dominican Republic following the 2013 trip. (*Id.*) In all, Basilio thought WKBM stayed in the United States for around five months in 2013. (*Id.*) At the end of WKBM's first trip to the United States, in late October 2013,[4] Basilio traveled to the Dominican Republic with WKBM and stayed for nine days. (*Id.* at 51.) At that time, Basilio testified, he and Moreno agreed that WKBM would return to the United States within six months so that WKBM would not lose her permanent resident status. (*Id.*) According to Basilio, Moreno had no objection at that time. (*Id.* at 51-52.)

Basilio said that the next time WKBM came to the United States was in April 2014, and that he and Moreno decided by that time that WKBM would stay with him indefinitely so that she could go to school in the United States. (*Id.* at 52-53, 55.) Basilio said he and Moreno agreed that WKBM would return to the Dominican Republic during vacations. (*Id.* at 53, 65.) He conceded that he had nothing in writing from Moreno supporting his claim that Moreno agreed that WKBM would live with Basilio permanently. (*Id.* at 62.)

---

[3] Basilio said that the physical green card did not arrive until later, so WKBM traveled using a passport at the beginning of the 2013 trip. (Trans. at 50.)

[4] The dates of WKBM's 2013 trip were not particularly clear from Basilio's testimony. Basilio said that the date of WKBM's return to the Dominican Republic was October 28, 2013—at least six (and possibly closer to seven) months after April 2013, when Basilio said WKBM arrived in New York.

Basilio said that Moreno first objected to WKBM's residence in the United States about two or three months after WKBM's April 2014 arrival in the United States, and demanded that Basilio return WKBM to the Dominican Republic.  (*Id.* at 54-55.)  Around the same time, Basilio said that the child's maternal grandmother told him that if WKBM returned to the Dominican Republic, he would never see her again.  (*Id.* at 53, 59.)  Basilio said he was not aware at the time that Moreno had filed papers in the Dominican Republic in July 2014 that sought WKBM's return.  (*Id.* at 62.)

Basilio acknowledged that WKBM had not visited the Dominican Republic since April 2014, but (after a confusing colloquy) stated that WKBM had not returned because she had just arrived in the United States months before last year's summer vacation.  (*Id.* at 56-58.)  He said that, for this reason and also because he was afraid WKBM would lose her green card, it was better for WKBM to stay with him in New York.  (*Id.* at 59.)  Basilio consented to WKBM's visiting the Dominican Republic for vacations, but said he wanted WKBM to attend school in the United States.  (*Id.*)

When asked why WKBM arrived in the United States with only a few suitcases of possessions, Basilio testified that he had planned to buy WKBM new clothing, and beyond that, he did not know why WKBM brought only a small portion of her belongings with her to New York.  (*Id.* at 55.)  He conceded that he has not asked Moreno to send WKBM's belongings to her in New York.  (*Id.* at 63.)  Basilio said that he and his relatives had bought clothing and other items for WKBM since her arrival.  (*Id.* at 63-64.)  As of the date of the hearing, according to Basilio, WKBM was speaking with Moreno about every three days.  (*Id.* at 53.)

Basilio expressed concern several times in his testimony that it was unsafe for WKBM to live in the Dominican Republic because she would have to travel to school by motorcycle, which

6

can be dangerous.  In contrast, WKBM's school in New York is close by and would not involve such travel.  (*Id.* at 54-55, 65.)

### 3. Documents

Basilio offered into evidence a travel authorization concerning WKBM's trip in April 2014.  (Resp. Ex. 1.)  The authorization, dated March 31, 2014, permits WKBM, accompanied by her godfather, Ramon Antonio Fajardo Ravelo, to travel to New York City on April 5, 2014. It does not specify an end date or otherwise limit the scope of WKBM's travel.  It is undisputed that both parents signed the travel authorization.  (Trans. at 18.)

A copy of WKBM's U.S. permanent resident card was also admitted into evidence. (Resp. Ex. 2.)  It states that WKBM became a permanent resident of the United States on July 30, 2013.[5]

### 4. Proposed Testimony by WKBM

At the hearing on April 27, 2015, the Court asked for the views of the parties on an *in camera* interview of WKBM.  (Trans. at 69.)  At that time, Basilio was supportive of an interview, while Moreno opposed it.  (*Id.* at 69-71.)  In a telephone conference on April 28, however, both Basilio and Moreno opposed the idea of speaking with the child, and the Court decided against it.

Now, in his brief, Basilio also raises a grave risk defense on the ground that WKBM may be settled in the environment in the United States such that repatriating her to the Dominican Republic would pose a grave risk of harm.  He requests that the Court interview WKBM to make this determination.  (*See* Dkt. No. 16 ("Resp. Br.") at 13-15 (citing *Blondin v. Dubois*, 238 F.3d

---

[5] The date on the green card does not appear to precisely align with Basilio's testimony.  He testified that WKBM received approval for her green card and came to the United States for the first time in April 2013.  (Trans. at 49-50.)  Basilio did note that the green card arrived later, but he did not specify how long it took, or if WKBM did not in fact receive permanent resident status until several months later.  (*See id.* at 50.)

153 (2d Cir. 2001)).)  Basilio did not offer evidence into the record on this point at the April 27

hearing, and he was opposed to the Court's speaking with WKBM during the April 28

conference.  The Court does not believe that the testimony of WKBM, who even now has not yet

reached six years of age, would be reliably probative or otherwise helpful.[6]  Accordingly, no

testimony was taken from WKBM in this matter.

### B.     Procedural History

Moreno first began proceedings seeking WKBM's return with authorities in the

Dominican Republic in July 2014.  (Pet. Ex. E; *see also* Trans. at 23-24.)  In October 2014, the

U.S. State Department contacted Basilio by letter, stating that Moreno had sought WKBM's

return to the Dominican Republic and inquiring as to whether Basilio was interested in working

with Moreno to resolve the issue.  There is no record of any response.

Moreno commenced this action under the Hague Convention on March 31, 2015.  (Dkt.

No. 1 ("Petition").)  Shortly thereafter, the Petition was served on Basilio.  (Dkt. No. 5.)  The

Court received testimony and other evidence relevant to the Petition on April 27, 2015.  At the

hearing, Basilio and his counsel were present in the courtroom, as was Moreno's New York

counsel.  Moreno and her counsel in the Dominican Republic participated in the conference by

telephone.  The Court granted the parties' request to submit further evidence and briefing during

a telephone conference held on April 28, 2015.  Briefs were to be submitted by June 8, 2015.

Following several extensions requested by counsel, Basilio filed his brief on June 23, 2015, and

Moreno filed her brief on July 7, 2015.[7]

---

[6] To the extent that the Court construes Basilio's belated application as a request for
reconsideration of its decision not to speak with WKBM, that request is denied.

[7] Counsel for both parties had difficulty meeting deadlines, which delayed the ultimate resolution
of this case.  After an extension from the initial brief due date of June 8, both parties' briefs were
to be filed on June 22, 2015.  (Dkt. Nos. 12-13.)  Respondent's counsel filed a brief one day late.
(Dkt. No. 16.)  Several days after the deadline, Petitioner's counsel requested an extension of

II.     **Legal Standard**

"To address the problem of international child abductions during domestic disputes, in 1980 the Hague Conference on Private International Law adopted the Convention on the Civil Aspects of International Child Abduction." *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1228 (2014) (citation and internal quotation marks omitted). The Convention is implemented in the United States by the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* ("ICARA").[8] *See Ermini v. Vittori*, 758 F.3d 153, 156 (2d Cir. 2014).

The Hague Convention "generally requires courts in the United States to order children returned to their countries of habitual residence, if the courts find that the children have been wrongfully removed to or retained in the United States." *Chafin v. Chafin*, 133 S. Ct. 1017, 1021 (2013); *see also Abbott v. Abbott*, 560 U.S. 1, 9 (2010) ("When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." (quoting Hague Convention arts. 4, 12)). "The Convention's remedy of repatriation is designed to preserve the status quo in the child's country of habitual residence and deter parents from crossing international boundaries in search of a more sympathetic court." *Souratgar v. Lee*, 720 F.3d 96, 102 (2d Cir. 2013) (internal quotation marks omitted). "The court can decide only the merits of the abduction claim, and has no authority to determine the underlying custody dispute." *Mero v. Prieto*, 557 F. Supp. 2d 357, 374 (E.D.N.Y. 2008) (citing *Blondin v. Dubois*, 189 F.3d 240, 245-46 (2d Cir. 2001)).

---

time *nunc pro tunc* until July 6, 2015, on the ground that he received the transcript belatedly. (Dkt. No. 17.) Petitioner's counsel did not file a brief until July 7, 2015. (Dkt. No. 19.)

[8] Until recently, ICARA was codified at 42 U.S.C. § 11601 *et seq.* After an "editorial reclassification," ICARA is currently codified at 22 U.S.C. § 9001 *et seq.*

The removal or retention of a child under 16 years of age is wrongful for purposes of the Convention where:

> [1] it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> [2] at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Ermini*, 758 F.3d at 161 (quoting Hague Convention art. 3) (brackets in *Ermini*).  Thus, to make out a prima facie case for the return of the child, the petitioner must demonstrate three elements: "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention."  *Hofmann v. Sender*, 716 F.3d 282, 291 (2d Cir. 2013) (quoting *Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005)) (internal quotation marks omitted).  The prima facie case must be established by a preponderance of the evidence.  22 U.S.C. § 9003(e)(1)(A).

"Wrongful removal or retention, however, does not end the matter.  If a parent establishes that the removal or retention was wrongful, the child is to be returned unless the defendant establishes one of [several] defenses."  *Ermini*, 758 F.3d at 161.  Only one of those defenses is relevant here: the responding parent may demonstrate by a preponderance of the evidence that "the person . . . having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the

removal or retention."[9]   Hague Convention art. 13(a); *see Taveras v. Morales*, 22 F. Supp. 3d

219, 229 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 55 (2d Cir. 2015) (summary order); *see also* 22

U.S.C. § 9003(e)(2)(B).

## III.   Discussion

### A.   Prima Facie Case: Uncontested Elements

Petitioner's burden to establish much of the prima facie case under the Hague Convention

is satisfied because Respondent does not contest several elements.   Preliminarily, the parties

agree that the Hague Convention applies to this dispute.   WKBM is under 16 years old (Trans. at

13); the parties stipulated that she was a habitual resident of the Dominican Republic prior to

April 2014 (*id.* at 12-13); and the United States and the Dominican Republic are contracting

parties under the Convention.[10]

---

[9] At one point, Respondent suggested that he would pursue a defense based on the risk of harm
to WKBM—in other words, that "there is a grave risk that the child's return would expose the
child to physical or psychological harm or otherwise place the child in an intolerable situation."
*Ermini*, 758 F.3d at 161 (quoting Hague Convention art. 13(b)) (brackets omitted).   This defense
must be proven by clear and convincing evidence.   *See* 22 U.S.C. § 9003(e)(2)(A).   While
Respondent raised his concern that living in the Dominican Republic might be dangerous for
WKBM due to the need to travel to school by motorcycle, the Court concludes that he has fallen
far short of making a clear and convincing showing of grave risk on this ground.   Nor has
Respondent shown by clear and convincing evidence that WKBM is so settled in her new
environment that repatriation could pose a grave risk of psychological harm.

Respondent has not raised the other potential defenses, which include: (1) that "the child
objects to being returned and is sufficiently mature for the Court to consider its views," and
(2) that the "return of the child 'would not be permitted by the fundamental principles of the
requested State relating to the protection of human rights and fundamental freedoms.'" *Taveras*,
22 F. Supp. 3d at 229 (citing Hague Convention arts. 13, 20).   A final defense—that the child is
"now settled in its new environment"—is available only where "the proceeding was commenced
more than one year after the wrongful removal or retention."   *Id.* (citing Hague Convention art.
12).   Here, it is undisputed that the allegedly wrongful retention of WKBM in the United States
took place less than one year before the filing of the Petition; consequently, the "now settled"
defense is unavailable to Respondent.

[10] *See International Parental Child Abduction: Dominican Republic*, U.S. DEP'T OF STATE,
http://travel.state.gov/content/childabduction/english/country/dominicanrepublic.html (last
updated Feb. 13, 2015) (stating that the Dominican Republic is a U.S. Treaty Partner under the
Hague Convention); *see also Acceptances of Accessions: Dominican Republic*, HAGUE CONF. ON

Furthermore, it is clear that Moreno was actually exercising her custody rights over WKBM prior to the time when she was retained by Basilio in the United States.  As the Department of State noted in its analysis of the Hague Convention, "[v]ery little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised. The applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child." *Olguin v. Cruz Santana*, No. 03 Civ. 6299 (JG), 2004 WL 1752444, at *4 (E.D.N.Y. Aug. 5, 2004) (quoting Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,507 (Mar. 26, 1986)).  From WKBM's birth until April 2014, the undisputed evidence demonstrates that the child was in Moreno's care except for the single prior trip to visit Basilio in the United States in 2013.  The Court concludes that the evidence plainly suffices for a preliminary showing that Moreno actually exercised custody over WKBM until April 2014.

**B.     Breach of Custody Rights**

Only the second element of the prima facie case—wrongful removal or retention—is contested here.  (Resp. Br. at 8.)  This element requires Moreno to demonstrate that Basilio breached Moreno's custody rights under the law of the Dominican Republic by wrongfully retaining WKBM in the United States.  *See Hofmann*, 716 F.3d at 291.  The Court concludes that Moreno has failed to establish this element by a preponderance of the evidence.[11]

---

PRIVATE INT'L LAW, http://www.hcch.net/index_en.php?act=status.accept&mid=923 (last visited Aug. 19, 2015).

[11] Some courts and commentators have noted "an apparent tension" in cases where a court finds "that an act of retention is unlawful and yet the product of consent."  *In re Kim*, 404 F. Supp. 2d 495, 515 n.38 (S.D.N.Y. 2005).  Some commentators have proposed that the two inquiries are distinct, and that the difference lies in the location of the burden—that is, "that the initial question is only whether a Hague Convention petitioner has established a *prima facie* case of unlawful retention, which can be rebutted by proof offered by Respondent."  *Id.* (citing Paul R. Beaumont & Peter E. McEleavy, The Hague Convention on International Child Abduction 133

1.      **Legal Framework**

The Hague Convention "defines 'rights of custody' as 'including rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" *Ozaltin v. Ozaltin*, 708 F.3d 355, 366 (2d Cir. 2013) (quoting Hague Convention art. 5) (brackets omitted). "[T]he Convention's broad definition of rights of custody is not constrained to traditional notions of physical custody. Instead, the Convention recognizes the increasingly common exercise of joint legal custody, in which one parent cares for the child while the other has joint decisionmaking authority concerning the child's welfare." *Id.* at 367 (citing *Abbott*, 560 U.S. at 12) (internal citation and quotation marks omitted). Rights of custody "may arise . . . by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of" the country of habitual residence. *Gitter*, 396 F.3d at 130 (quoting Hague Convention art. 3). In determining whether a parent's removal or retention of a child is wrongful, the Court "may take notice directly of the law of, and of judicial or administrative decisions, formally recognised or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." Hague Convention art. 14.

a.      **Joint Custody**

According to documents submitted by Petitioner, parental authority under Article 67 of the Dominican Republic's Code of the Minor "is the set of rights and duties that belong equally to the father and mother, in relation to the sons and daughters who have not attained [the] age of majority." (Pet. Ex. D.) Furthermore, "[w]hen both parents have parental authority and none of

_____

(1999)). Here, the Court need not explore this question because the Court finds that the evidence Moreno offers fails to establish a prima facie case of unlawful retention.

the causes established [i]n Article 72" of the Code of the Minor—that is, the majority,

emancipation, or death of the child, or the termination of parental authority by a court order—

both parents "have equal rights over their children." (*Id.*)  Because none of these events has

taken place, the parties agree that Basilio and Moreno share joint custodial rights over WKBM

under Dominican law.

### b.  *Ne Exeat* Right

In *Abbott v. Abbott*, the Supreme Court held that a *ne exeat* right—that is, "the authority

to consent before the other parent may take the child to another country"—also qualified as a

"right of custody" that is cognizable under the treaty.  560 U.S. at 5, 10.  Thus, where a removal

or retention "was in violation of the petitioner's custody rights—[including] a *ne exeat* right," it

is wrongful.  *Duran v. Beaumont*, 622 F.3d 97, 98 (2d Cir. 2010) (per curiam).  *Abbott* concerned

a Chilean law that provided that, where one parent had visitation rights, "that parent's

'authorization shall also be required' before the child may be taken out of the country" in most

cases.  560 U.S. at 10 (ellipsis omitted).  The Supreme Court recognized that a *ne exeat* right

gives a parent "both the joint 'right to determine the child's place of residence' and joint 'rights

relating to the care of the person of the child.'"  *Id.* at 11 (citing Hague Convention art. 5(a)).

Because WKBM was habitually residing in the Dominican Republic, the Court looks to

Dominican law to determine whether Moreno held a *ne exeat* right.  Under the Code of the

Minor of the Dominican Republic, a parent may leave the country with his child only if he has

the consent of the child's other parent.  As the Sixth Circuit recently noted in another case

looking to Dominican law:

> Article 204 of the New Code of the Minor Law No. 136-03
> provides in relevant part: "If one of the parents is going to leave
> the country with one of their children, the parent will not be able to
> do so without the written consent of the other."  New Code of the
> Minor Law No. 136-03, tit. V, ch. II, art. 204 . . . .  Article 110 of

14

> this statute further provides in part that "when a person goes
> beyond their rights which have been recognized; retains a boy, girl,
> or adolescent, or moves him to a place or country different from
> that which is his habitual residence, without the necessary
> authorization, it will be considered an illegal movement or
> retention of the boy, girl, or adolescent.  The Public Ministry of
> Boys, Girls, and Adolescents must return the boy, girl, or
> adolescent to the person that legally has guardianship."  New Code
> of the Minor Law No. 136-03 at tit. IV, ch. V, art. 110.

*Taveras v. Taveraz*, 477 F.3d 767, 778-79 (6th Cir. 2007) (brackets omitted).  Article 204 of the

Code of the Minor also provides that children may travel outside the country only with their

parents or guardians; otherwise, the law requires a notarized travel authorization.  Under these

provisions of Dominican law, Moreno possessed a *ne exeat* right concerning WKBM's removal

from the Dominican Republic.

## 2.    Application

The Court concludes that Moreno has failed to demonstrate, by a preponderance of the

evidence, that Basilio violated Moreno's custody rights over WKBM.  Initially, it is undisputed

that WKBM's *removal* from the Dominican Republic was not in breach of any custody right.

Moreno explicitly consented to WKBM's departure from the country to visit Basilio in New

York by signing the travel authorization.  This may preclude Moreno from establishing a

violation of a *ne exeat* right under Dominican law.[12]  But even where a parent has consented to

removal, the *retention* of the child beyond "certain conditions or circumstances" agreed upon by

the parents may be wrongful.  *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005).  Moreno

---

[12] At least one court has found that an unlawful *retention* can violate a *ne exeat* right.  *See Font Paulus ex rel. P.F.V. v. Vittini Cordero*, No. 12 Civ. 986, 2012 WL 2524772, at *5 (M.D. Pa. June 29, 2012) (concluding that, when a respondent retained her child outside the Dominican Republic beyond her authorization, she "violat[ed] [the petitioner's] *ne exeat* rights").  The Court need not address this question: because joint custody provides a separate source of custodial rights here, the existence of a *ne exeat* right against unlawful retention is not dispositive.

contends that Basilio did so by retaining WKBM in the United States beyond the scope of her

consent, which permitted only a 15-day vacation in the United States.

In analyzing this issue, the Court examines the evidence of the parties' agreement,

including their testimony and other circumstantial evidence.  The Court was confronted with

inconsistent versions of the key facts, and there was little in the way of evidence beyond the

parties' testimony.[13]  Thus, this decision must rely "largely on the Court's assessment of the

credibility of the witnesses."  *In re Kim*, 404 F. Supp. 2d 495, 520 (S.D.N.Y. 2005).

Upon consideration of the testimony and all of the evidence, the Court was left with

significant doubt about Moreno's credibility.  Because her testimony concerning the parties'

agreements about WKBM's residence cannot be believed, the Court finds that Moreno has not

established by a preponderance of the evidence that Basilio retained WKBM in violation of

Moreno's custodial rights.  *Cf. In re D.A.*, No. 14 Civ. 5836 (PKC), 2015 WL 2344079, at *6

(E.D.N.Y. May 14, 2015) (concluding, based on witness testimony and circumstantial evidence,

that the petitioner had "consented to [the respondent's] removal of [the child] from Greece . . .

and his retention in the United States thereafter").

Moreno contends that WKBM came to the United States only for a 15-day visit, and that

Basilio violated her custodial rights by retaining WKBM beyond that period.  Basilio, on the

other hand, asserts that he had agreed with Moreno that WKBM would live with him

permanently in New York starting in April 2014, and that Moreno only began to object some two

or three months later.  For the reasons set out below, the Court credits Basilio's testimony that he

agreed with Moreno that WKBM would come to live with him permanently, or at least

---

[13] This is a difficult case, not least because of the nature of the evidence presented.  Unlike other
Hague Convention decisions that rely on written communications between the parents that shed
light on their intent, the testimony of third parties, and other evidence, *see, e.g.*, *In re Kim*, 404 F.
Supp. 2d at 495, 515-20, the evidence in this case consisted largely of the sharply conflicting oral
testimony of Moreno and Basilio.

indefinitely, in New York.  The Court cannot credit Moreno's assertion that she expressly limited her permission for WKBM's New York visit to 15 days, or even that she meaningfully restricted her consent to WKBM's living with Basilio in New York.

*The travel authorization.*  In the verified Petition, Moreno asserted that the travel authorization "explicitly permitted the child to travel outside the Dominican Republic for a limited period of 15 days, requiring that the child return to her home in the Dominican Republic on or before April 22nd, 2014." (Pet. ¶ 12.)  But the authorization says nothing of the sort. Rather, the travel authorization, which is in evidence, provides no end date for WKBM's travel to the United States.  Thus, the travel authorization provides no support for Moreno's assertion that the visit was limited to 15 days.  By the time of her testimony, Moreno no longer asserted that the written authorization provided the 15-day limitation, and admitted that there was only a "verbal agreement" concerning the length of travel.  (Trans. at 19.)

*The green card.*  WKBM's green card provides persuasive evidence supporting Basilio's version of the parents' agreement.  Basilio testified that Moreno assented to his applying for permanent residency on behalf of WKBM, while Moreno denied consenting.  (Trans. at 30-31, 48.)  After considering the testimony on this point in light of the witnesses' statements and demeanor at the April 2014 hearing, the Court discredits Moreno's testimony that she objected to and was unaware of WKBM's U.S. permanent resident status throughout the relevant period. Instead, the Court finds that Moreno agreed to permit WKBM to apply for a green card, and is aware that WKBM has held U.S. permanent resident status since 2013.

WKBM's green card—which Moreno acknowledged she held for a period of time— prominently features the words "United States of America" and "Permanent Resident."[14]  (Resp.

---

[14] The Court takes notice of the fact that the U.S. Citizenship and Immigration Services translates permanent residency into Spanish as "Residencia Permanente," and refers to the green card in

17

Ex. 2.)  Moreover, Moreno admitted that she personally took WKBM to the U.S. Consulate as part of the process that allowed WKBM to obtain this status.[15]  She conceded that Basilio had told her that WKBM would need to return to the United States at least every six months in order to maintain her status—which conflicts with Moreno's earlier testimony that she was unaware that WKBM was a permanent resident at the time.  The Court concludes that Moreno's knowledge of WKBM's permanent resident status and the fact that it required WKBM to return regularly to the United States provides significant support for Basilio's assertion that he agreed with Moreno that WKBM would live indefinitely with Basilio in New York.[16]

---

Spanish as the "Tarjeta Verde."  *See Tarjeta Verde*, U.S. Citizenship & Immigr. Servs., http://www.uscis.gov/es/tarjeta-verde (last visited Aug. 19, 2015).  These cognates make it implausible that Moreno did not understand what the green card was.

[15] Basilio initially informed the Court that he intended to seek documentation from the U.S. Consulate in the Dominican Republic that would demonstrate Moreno's consent to (or at least awareness of) WKBM's petition for a green card.  Subsequently, however, Basilio's counsel asserted in a telephone conference that the time required to obtain those documents would be prohibitive.  In any event, the Court concludes that the existence of such records would not alter its findings on this point.

[16] Moreno later testified that she thought WKBM would return to the United States, but only with sufficient regularity to preserve her status, and would (at the appropriate time) decide for herself whether she wanted to live in the United States or in the Dominican Republic.  Certain other cases have recognized this line of logic where it aligned with the remainder of the parties' credible testimony.  *See Taveras*, 22 F. Supp. 3d at 230 (rejecting argument that "because permanent residents may leave the United States only temporarily and must always intend to return, [the petitioner] therefore must have intended that [the child] would make the United States her home" where it was inconsistent with the evidence of parties' intentions regarding the child's travel to the United States); *see also Font Paulus*, 2012 WL 2524772, at *4 (crediting petitioner's testimony that he "believed permanent residency status would be used for [the child] to travel to the United States for vacations only, and that [the child] would ultimately decide her residence upon turning eighteen").  Here, however, the Court does not find Moreno's stated belief about WKBM's choices concerning her permanent resident status to be believable, in light of Moreno's prior, conflicting testimony in which she stated that she (1) objected to WKBM's obtaining permanent residency and (2) was unaware that WKBM had obtained permanent resident status.

*WKBM's possessions.*  Moreno relied heavily on the fact that WKBM brought only a few suitcases of possessions with her to the United States.  Basilio said he did not know why more possessions were not sent with WKBM, and did not make arrangements to send those belongings from the Dominican Republic.  (Trans. at 55, 63.)  This evidence does have some tendency to indicate that WKBM's April 2014 travel to the United States was not meant to be permanent.  However, Basilio testified that he and his relatives bought WKBM clothing after her arrival in New York.  (*Id.* at 63-64.)  *Cf. In re Kim*, 404 F. Supp. 2d at 520 (dismissing evidence that child "had very few belongings . . . when she . . . arrived in New York," in part because the child's father purchased other clothing for her after her arrival).  Ultimately, these facts are somewhat ambiguous, and the Court does not give them significant weight.

*Conditional permission.*  Even if a parent has consented to removal, the retention of the child beyond "certain conditions or circumstances" agreed upon by the parents may constitute wrongful removal.  *Baxter*, 423 F.3d at 370.  Moreno argues that, even accepting Basilio's version of the parties' agreement, WKBM was to spend vacations in the Dominican Republic with her mother—and WKBM has not returned "despite the fact that the child has been in the United States for over a year now."  (Dkt. No. 19 ("Pet. Br.") at 8.)  The Court is unconvinced.  Moreno has not established by a preponderance of the evidence that there were such conditions or circumstances placed upon WKBM's residence in the United States at the time of the parties' agreement.  Basilio testified that he and Moreno agreed for WKBM to "come [to New York] and stay with me and I will send [WKBM] over [to the Dominican Republic] for vacation."  (Trans. at 53.)  But this qualification is too vague to be relied upon in this context.  Because it appears to

be untethered to any particular timeframe, it is difficult, if not impossible, to determine whether Basilio has violated it.[17]

In light of all the evidence, the Court credits Basilio's testimony and finds that WKBM's parents agreed that WKBM would come to live with Basilio in New York indefinitely.[18]  The parties apparently had discussed, in general terms, that WKBM would visit Moreno in the Dominican Republic, but the Court does not find this to be an enforceable condition of the agreement.[19]  Moreno has failed to establish a prima facie case of wrongful removal.  Therefore, the petition must be denied.

### C.    Consent Defense

Alternatively, Basilio has established the defense of consent or acquiescence by a preponderance of the evidence.  Under Article 13 of the Convention, a court is "not bound to order the return of the child" if the respondent establishes that "the person . . . having the care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention."  Hague Convention art. 13(a); *see also Mota v. Castillo*, 692 F.3d 108, 117 (2d Cir.

---

[17] Basilio also suggested that he was afraid that WKBM would lose her green card if Moreno or her family retained WKBM in the Dominican Republic during such a vacation.  (Trans. at 59.)  While there was little evidence on this point, it could provide a reason that he did not send WKBM back to visit Moreno in the Dominican Republic during the pendency of the dispute over custody of WKBM.

[18] The Court's findings regarding the parties' agreement might also have been relevant to the issue of WKBM's habitual residence, if Respondent had disputed this point.  For purposes of the Hague Convention, a child's habitual residence is primarily determined by "the shared intention of the child's parents at the latest time that their intent was shared."  *Mota v. Castillo*, 692 F.3d 108, 113-14 (2d Cir. 2012) (quoting *Gitter*, 396 F.3d at 134).  Because the parties to this case agreed that the WKBM's habitual residence was in the Dominican Republic, the Court does not address this point further.

[19] Any questions remaining about the division of custody between Moreno and Basilio cannot be answered by this Court, which is not empowered by the Convention to make custody decisions.  *See Hollis v. O'Driscoll*, 739 F.3d 108, 112 (2d Cir. 2014) (stating that "the merits of the underlying custody claim" are "beyond the scope of [a court's] authority in resolving Hague Convention claims").

2012).  "Consent and acquiescence are analytically distinct defenses to return under the Convention."  *Walker v. Walker*, 701 F.3d 1110, 1122 (7th Cir. 2012).  "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention."  *Baxter*, 423 F.3d at 371.  "The key to the consent inquiry is the petitioner's subjective intent, including the nature and scope of the alleged consent."  *In re Kim*, 404 F. Supp. 2d at 516.

The same factual findings that preclude Moreno from showing wrongful removal also establish Basilio's consent defense.  The Court credits Basilio's testimony that he and Moreno agreed prior to the April 2014 trip that WKBM would come to live with Basilio indefinitely.  Accordingly, even were Moreno to have established a prima facie case under the Convention, her consent to WKBM's removal from the Dominican Republic and her retention in the United States would serve as a basis for the Court to deny her petition.  *See In re Kim*, 404 F. Supp. 2d at 520-21.

## IV.    Conclusion

For the foregoing reasons, it is hereby ordered that the Petition is DENIED.  The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: August 19, 2015
       New York, New York

_____
                J. PAUL OETKEN
          United States District Judge